FILED
IN CLERK'S OFFICE
U.S ... D.N.Y.
★ JUL 31 2009 ★
BROOKLYN OFFICE

D|P

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SHAWN H HALL,

                               Plaintiff,

             -against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**

**06-cv-1000(NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

    Shawn H. Hall ("Plaintiff") seeks judicial review pursuant to Section 205(g) of the Social Security Act ("SSA"), 42 U.S.C. § 405(g), of the final determination of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner moves for judgment on the pleadings seeking to affirm his decision. The issue before the court is whether the Commissioner's decision is supported by substantial evidence and based upon the correct legal standards. For the reasons that follow, the Commissioner's Motion for Judgment on the Pleadings is granted and his decision affirmed.

**I.    BACKGROUND**

    **A.    Plaintiff's Personal and Employment History**

    As set forth in the record, Plaintiff was born on June 30, 1967 and was thirty-eight years old at the time of the ALJ's decision. (Transcript of the Record ("Tr.") at 102, 204.) At that time, the highest level of education he had completed was one year of college, and he had previously worked as a mail handler, roofer, electrician helper, construction worker, and plumber helper. (Id. at 206-08, 47-51, 96, 69-76.) Plaintiff claims that he became disabled when his

1

Human Immunodeficiency Virus ("HIV") first began to bother him on July 5, 2002. (Id. at 52-53.)

In June 2003, Plaintiff applied for disability benefits, stating that he had never before filed for SSI benefits. (Id. at 41-42.) In the work history report that he completed for the Social Security Administration, Plaintiff stated that his job as mail handler (1) frequently required him to lift and carry bundles of mail that weighed ten pounds, (2) occasionally required him to lift and carry twenty-pound bundles, and (3) required him to stand or walk for up to six hours. (Id. at 71.) In the function report he completed, Plaintiff stated that he could walk three blocks at a time, stand for forty-five minutes continuously, and lift up to twenty pounds. (Id. at 82.) Plaintiff also acknowledged his ability to engage in the following activities: reading the Bible, watching movies and television, taking care of his stepchildren, doing jigsaw puzzles, feeding his dog, taking his dog outside, grocery shopping, cooking food, and doing some house cleaning. (Id. 78-82.)

### B. Plaintiff's Medical History

Plaintiff was treated for HIV from May 2003 through April 2005 at the New York Hospital Medical Center of Queens ("NYHQ"), and during this time his illness steadily became more stabilized and his general health improved. (Id. at 121-193.) The medical records from NYHQ show that he was first diagnosed with HIV on May 19, 2003 and that treatment began that same day. (Id. at 174.) Plaintiff denied having any medical history related to HIV before this date and stated that he donated blood as recently as 1996. (Id. at 170.) On May 19, 2003, Plaintiff complained of a skin rash from allergies, and reported that over the past few months his

weight decreased by forty-five pounds. (Id. at 174.) On May 26, 2003, lab results showed that Plaintiff's CD4 count was 120. (Id. at 169.)[1]

In June 2003, the attending physician at NYHQ diagnosed Plaintiff with HIV-AIDS. (Id. at 172.) During the examination, the attending physician observed that Plaintiff weighed 115 pounds and is six feet tall, and that he had some seborrhea dermatitis on his face, for which he was prescribed Lotrisone ointment. (Id. at 171-72.) During this visit, Plaintiff denied feeling any symptoms of depression, insomnia or anemia. (Id. at 170.) The attending physician found Plaintiff had symptoms of wasting because of his "thin lean frame." (Id. at 172.)[2] As of June 2003, Plaintiff's viral load was greater than one million copies, his CD4 count was 100, and he had tested negative for hepatitis. (Id. at 165.)

On July 9, 2003, Plaintiff reported to the same attending physician that the Lotrisone had resolved his seborrhea dermatitis. (Id. at 174.) He reported that he had no nausea, vomiting, weight loss, diarrhea or any opportunistic infections. (Id.) The attending physician prescribed Plaintiff a highly active anti-retroviral treatment ("HAART"). (Id. at 175.) On July 10, 2003 a nurse practitioner, Roxanne Stubbs, answered a medical questionnaire for the New York State Office of Temporary and Disability Assistance ("NYSOTDA"). (Id. at 108-12.) She noted that she had first seen Plaintiff on May 22, 2003 and last examined him on June 17, 2003. (Id. at

---

[1] "Viral load measures HIV replication in the body. T-helper lymphocyte ("CD4") cells help the body fight off infection and disease. CD4 cell counts in someone with a healthy immune system range from 500 to 1800. When the CD4 count falls below 200, the person has AIDS. There is usually a correlation between the CD4 count and the viral load; if there is a low CD4 count, then there will be a high viral load. A low baseline viral load is considered 500 or less; a high baseline viral load is over 40,000." Roman v. Barnhart, 477 F. Supp. 2d 587, 592 n. 4 (S.D.N.Y. 2007) (internal quotation marks omitted).

[2] "HIV wasting syndrome [is] defined as involuntary weight loss of 10 percent or more of baseline (or other significant involuntary weight loss, as described in 14.00D2) and, in the absence of a concurrent illness that could explain the findings . . . [such as] chronic diarrhea with two or more loose daily lasting for 1 month or longer. Section 14.00D2 of the Listings clarifies that the significant involuntary weight loss listed in § 14.08J does not correspond to a specific amount or percentage of weight loss." Murray v. Apfel, No. CV-97-6046 (ERK), 1998 WL 412639, at *7 (E.D.N.Y. May 26, 1998) (internal quotation marks omitted).

3

108.) She reported that her treating diagnosis was acquired immunodeficiency syndrome ("AIDS"), that Plaintiff's medications included Trizivir, Sustiva, and Bactrim, and recorded that Plaintiff weighed 115 pounds in the two months she treated him. (Id. at 108.) She assessed that Plaintiff could frequently lift or carry twenty pounds, determined that in an eight-hour workday he could sit for six hours, stand for two hours, and walk for one hour, and found Plaintiff's ability to travel long distances by bus or train was limited. (Id. at 109.)

On August 5, 2003 Plaintiff had a follow-up examination at NYHQ. (Id. at 175-76.) He told his treating physician, Dr. Marc Johnson, that he had no new complaints, and because his appetite had improved from being on HAART he had gained weight. (Id. at 175.) Plaintiff's viral load had decreased to 5271 copies, his CD4 count was 261, and there was only a small amount of seborrhea dermatitis left on his face. (Id. at 175, 162, 163, 176.) At the end of that visit, Dr. Johnson requested an anemia workup and prescribed Lotrisone ointment, Bactrim, Trizivir, and Sustiva. (Id. at 176.)[3]

On August 12, 2003, Dr. Johnson filled out a medical questionnaire for the NYSOTDA. (Id. at 101-06.) Dr. Johnson wrote that he began treating Plaintiff on June 17, 2003 and that an HIV test, completed on May 9, 2003, determined that Plaintiff had positive Immunoglobin G. (Id. at 101-02.) Dr. Johnson reported no current symptoms or opportunistic infections; his sole treating diagnoses were AIDS, anemia, and seborrhea dermatitis of the face. (Id. at 101-02.) He evaluated Plaintiff's abilities to lift, carry, push, pull, sit, stand, handle objects and walk, and reported that they were not limited by his condition. (Id. at 103.) Dr. Johnson also found Plaintiff did not have any manipulative, communicative, or other limitations, and that his

---

[3] The record indicates that the side effects of Sustiva are diarrhea and dizziness which last a few weeks, and the side effects of Trizivir are headaches, loss of sleep and loss of appetite. (See Tr. at 97, 99-100.)

4

memory, ability to understand, sustained concentration, persistence, social interaction, and adaption were not limited by his illness. (Id. at 104-05.)

From September 2003 through April 2005, Plaintiff frequently saw Dr. Johnson for follow-up examinations. (Id. at 121-58, 177-93.) He consistently reported that he did not have any recent illnesses, opportunistic infections, weight loss, or any adverse side effects from medication (such as nausea, vomiting or diarrhea). (Id. at 177-92.) The record indicates that during this period, Plaintiff's viral load decreased to less than 50 copies and his CD4 count had increased to 875. (Id. 177-93, 121-58.)

On September 16, 2003, Dr. Johnson observed that Plaintiff had responded well to medication and that his anemia workup was within normal limits. (Id. at 177.) That day, Plaintiff complained of fatigue, shortness of breath on exertion, and weakness. (Id.) On November 11, 2003, Plaintiff again denied having recent illness, nausea, vomiting, diarrhea or fever. (Id.) On December 30, 2003, Dr. Johnson observed that Plaintiff's wasting syndrome had abated since he had gained about thirty pounds since May 2003. (Id. at 181.) Also, after three months of treatment with the medication "Procrit," the doctor concluded that Plaintiff's anemia had also resolved. (Id. at 177, 181.)

On March 30, 2004 and June 22, 2004, Dr. Johnson noted that Plaintiff demonstrated a very good immune response to prescribed medication, and that Plaintiff had again denied having had any opportunistic infections, fevers, chills, weight loss, or symptoms of anemia, but that he did report occasional diarrhea. (Id. at 180, 182-83.) His weight was noted at this time as being 132 pounds. (Id. at 184.)

By October 2004, Plaintiff weighed 139 pounds, his viral load had decreased to 202, and his CD4 had increased to 797. (Id. at 188.) In November 2004, Plaintiff again denied having

any symptoms related to his illness. (Id. at 189.) Although Plaintiff complained of having had chest pain three days prior to his medical visit, Dr. Johnson noted that the previous October, Plaintiff had undergone a positive purified protein derivative ("PPD") test to determine if he had tuberculosis ("TB"), and he had chest x-rays taken which had been normal. (Id.) On November 29, 2004, Dr. Johnson noted Plaintiff's CD4 had increased to 915 and viral load had decreased to 126. (Id.) He also started Plaintiff on the medication "Isoniazid" because the PPD test came back positive. (Id.)

On January 4, 2005, Dr. Johnson noted that Plaintiff had not experienced problems since he started Isoniazid, and that he was expected to continue on medication together with vitamin B6 for six months. (Id. at 190.)[4] On February 15, 2005, when Plaintiff was asked by Dr. Johnson if he was depressed, he responded "I guess." (Id. at 191.) Dr. Johnson noted that Plaintiff had a "flat affect" during the examination, and complained of sleep disturbance, decreased appetite, and anhedonia. (Id.) He also noted that Plaintiff was willing to seek mental health evaluation and treatment. (Id.) Nevertheless, in April 2005, Plaintiff told Dr. Johnson that he felt less depressed and did not need any mental health treatment. (Id. at 193.) In April 2005, Plaintiff also denied having fever, chills, nausea, vomiting, or weight loss; his CD4 was up to 875 and viral load was less than 50. (Id.) Plaintiff denied any recent illness and denied any current symptoms. (Id.)

### C. Plaintiff's Testimony at the July 12, 2005 Hearing

At the outset of the administrative hearing, Plaintiff acknowledged that he had been previously advised in writing of his right to legal representation. (Id. at 201.) Administrative Law Judge Hazel C. Strauss ("ALJ") then explained the advantages of such representation and

---

[4] The record shows the side effects of Isoniazid are upset stomach and indigestion. (Tr. at 98.)

6

offered to grant "one final adjournment" in order for Plaintiff to obtain an attorney. (Id. at 201-02.) Plaintiff stated that he wished to proceed without counsel, and that he understood he was waiving his right to legal representation. (Id.)

Plaintiff testified that his disability was due to AIDS. (Id. at 211.) He stated that he had experienced some pain in his knees, hands, neck and back, and that he had not been treated for these pains because they are "not really that bad yet." (Id. at 216-18.) He also testified that he treated periodic headaches with Motrin, but that this would only sometimes relieve his pain. (Id. at 216.) He testified that he suffered symptoms like diarrhea, dizziness, vomiting, fatigue, severe tiredness, anemia and weight loss. (Id. at 211, 217-18.) He treats his diarrhea with Metamucil. (Id.)

Plaintiff testified that he had tested positive for TB in January 2005 and had been treated for six months with the medication "Isoniazid," which caused him to have diarrhea, vomiting, and tiredness. (Id. at 211-14.) The ALJ responded that she did not think it was clearly evidenced in the medical records that he had in fact tested positive for TB. (Id. at 214.) The ALJ told Plaintiff she would call his doctors to see if this information had been left out accidentally, but if no such medical evidence existed, she would make her decision based upon the existing records. (Id. at 214-15.)

Regarding his work history, Plaintiff testified that he stopped working in 2002. (Id. at 206.) He testified that he had been employed as a mail handler for the U.S. Postal Service from 1990 to 1991 and that this job required him to "pack bags with boxes and stuff" that weighed, at most, twenty pounds. (Id. at 208.) He also testified that he held other manual labor jobs from 1991-2001. (Id. at 206-09.)

7

Plaintiff testified that he is able to take care of his grooming and personal needs, prepare his meals, do his laundry, occasionally wash dishes, socialize with friends, attend medical appointments by public transportation, play with his dog in the park behind his house, and occasionally read magazines. (Id. at 219-22, 223.) He also testified that he does not use a computer, does not sweep or mop the floors, does not make his bed, and does not go shopping or to the movies. (Id. at 220-21.) He admitted that he does not have difficulty sitting or standing, was able to walk two blocks before becoming dizzy, and could lift or carry up to twenty-five pounds. (Id. 222-23.)

### D. Procedural History

On June, 10 2003, Plaintiff filed two applications, one for DIB payments and one for SSI payments, alleging disability based on his HIV+ status. (Id. at 41-43, 194-96.) Plaintiff's applications were denied on August 21, 2003. (Id. at 16-21.) Plaintiff then requested a hearing, which was held before the ALJ on July 12, 2005 in Jamaica, Queens. (Id. at 199-225.) As noted above, although Plaintiff was notified of his right to representation, he waived that right and chose to proceed without counsel. (Id. at 201-02.) The ALJ found that Plaintiff met the non-disability insured status requirements set forth in Section 216(i) of the Social Security Act through the date of her decision. (Id. at 14.) After the ALJ considered the evidence pertaining to Plaintiff's illness, however, she determined that Plaintiff did not meet the requirement that he be disabled within the meaning of the SSA and that he was therefore, ineligible for SSI or DIB benefits. (Id. at 15.) The ALJ's decision became the final decision of the Commissioner on December 27, 2005 when the Office of Hearings and Appeals denied Plaintiff's request for review of the ALJ's decision. (Id. at 3-6, 198.) Plaintiff filed this action on March 3, 2006. The

Commissioner answered on May 18, 2007, and moved for judgment on the pleadings on July 30, 2007.

## II. DISCUSSION

### A. Standard of Review

In reviewing the ALJ's decision, the court considers whether it is "supported by substantial evidence in the record as a whole" and is based upon the correct legal standards. Schaal v. Apfel, 134 F. 3d 496, 501 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F. 3d 126, 131 (2d Cir. 2000) (internal citation omitted). "[S]ubstantial evidence . . . [is] more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

"In deciding whether the [Commissioner's] conclusions are supported by substantial evidence, [the court] must first be satisfied that the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [SSA]." Cruz v. Sullivan, 912 F. 2d 8, 11 (2d Cir. 1990) (internal quotation marks omitted). In order to provide a full hearing, an "ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotation marks omitted). If the claimant is pro se, the ALJ has a duty to protect his or her rights "by ensuring that all of the relevant facts are sufficiently developed and considered." Cruz, 912 F.2d at 11 (internal quotation marks omitted). "While the administrative hearing is not designed to be adversarial, when the claimant

9

is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Id. (internal citations and quotation marks omitted).

## B. Determining Disability

To establish that he or she is disabled, a claimant must demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting 42 U.S.C. § 423(d)(1)(A)). The claimant initially bears the burden of proof on disability status and must present "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques[.]" 42 U.S.C. § 423(d)(5)(A); see Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (listing the types of medical and non-medical evidence the Commissioner should consider).

In order to determine whether a claimant is disabled and entitled to disability benefits, the Commissioner applies a five-step sequential analysis. See 20 C.F.R §§ 404.1520, 416.920; see also Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999). Under this analysis: "[(1) t]he Commissioner considers whether the claimant is currently engaged in substantial gainful activity[; (2) i]f not, the Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities[; (3) i]f the claimant has a 'severe impairment,' the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment that meets or equals one listed in Appendix 1 of the [SSA]. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him [or her] disabled, without considering vocational factors such as age, education,

and work experience[; (4) i]f the impairment is not 'listed' in the [SSA], however, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work[; (5) i]f the claimant is unable to perform his or her past work, the Commissioner must determine whether there is other work which the claimant could perform." See Shaw, 221 F.3d at 132; see also 20 C.F.R § 404.1520(4).

"In assessing disability, the [Commissioner] must make a thorough inquiry into the claimant's condition . . . . The facts that must be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983). The burden of proof is on Plaintiff for the first four steps of the sequential analysis; however, at the fifth step, the burden shifts to the Commissioner. See Shaw, 221 F.3d at 132.

### C. The ALJ's Decision

In her decision, the ALJ used the five-step analytical framework. (Tr. at 11-15.) After careful consideration of Plaintiff's applications, the ALJ concluded that he is entitled to neither DIB benefits nor SSI benefits under the SSA. (Id. at 15.) Plaintiff challenges the ALJ's disability determination arguing that, considered together, his illness, pain in his back and knees, headaches and medications allow him to sit, stand, or walk for no more than an hour a day. (See Docket Entry #12, at 1.) He claims that his headaches make him dizzy and render him harmful to himself and others around him. (Id.) He argues that he becomes weaker each day because of his illness and that, for this reason, he is disabled and unable to work. (Id.) As set forth below,

11

the court denies Plaintiff's challenge and concludes that the ALJ's findings are supported by substantial evidence and were not legally erroneous.

### i. Step 1

First, the ALJ had to determine if Plaintiff had engaged in substantial gainful activity since his disability onset date. The SSA regulations ("regulations") define substantial work activity as "work activity that involves doing significant physical or mental activities." See 20 C.F.R § 404.1572(a). "[A claimant's] work may be substantial even if it is done on a part-time basis or if [he or she] do[es] less, get paid less, or have less responsibility than when [he or she] worked before." Id. Gainful work activity is defined as "work activity [a claimant does] for pay or profit . . . whether or not a profit is realized." See 20 C.F.R. §404.1572(b). In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date, July 5, 2002, as that was the month he quit his last job. (Tr. at 11, 14, 52-53, 69.) Thus, the ALJ found that Plaintiff satisfied the first of the five steps.

### ii. Step 2

Second, the ALJ had to determine if Plaintiff had an impairment or impairments that would be considered "severe" under the regulations. A medically determinable impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. See 20 C.F.R § 404.1520(c); see also Bowen v. Yuckert, 482 U.S 137, 167 (1987). If one or more medically "severe" impairments exist, the regulations provide that "the combined impact" of any such impairments "will be considered throughout the disability determination process." See 20 C.F.R § 404.1523. If no medically severe impairment is found, however, the ALJ will determine that Plaintiff is not disabled. Id. In this case, the ALJ found that the medical evidence clearly indicated that Plaintiff has HIV-

12

AIDS and a history of anemia and wasting syndrome – these impairments are "severe" within the meaning of the SSA. (Tr. at 14.) Thus, the ALJ found that Plaintiff satisfied the second of the five steps.

### iii. Step 3

Third, the ALJ had to determine whether Plaintiff's impairments were severe enough to meet or medically equal, either singly or in combination, any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. It was Plaintiff's burden to show that his impairments were sufficient. See Zebley, 493 U.S. at 530. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Id. (emphasis in original). Relevant here is Section 14.08, which lists "Human immunodeficiency virus (HIV)." See 20 C.F.R Part 404, Subpart P, App. 1, Sec. 14.08. "Section 14.08 contains an exhaustive list of conditions which, in combination with a diagnosis of HIV or AIDS, qualify a claimant for disability insurance, including, inter alia, various bacterial, fungal, and viral infections, extreme weight loss and conditions of the skin and blood." Beckwithe v. Barnhart, 371 F. Supp. 2d 195, 200 (E.D.N.Y. 2005).

The ALJ considered Section 14.08 in her analysis and decided that Plaintiff's symptoms were not severe enough to meet or equal a listed impairment in 20 C.F.R Part 404, Subpart P, Appendix 1. (Tr. at 12-14.) In her review of the record, she determined that although Plaintiff suffered from wasting syndrome when his treatment began, according to the medical evidence he never suffered from either chronic diarrhea or chronic weakness as required by Section 14.08. (Id. at 12-13.) In fact, the record reflects that Plaintiff's wasting syndrome eventually ceased, based on treatment, and that his appetite and weight had improved. (Id. at 13, 174-82, 185, 193.)

13

Furthermore, the medical records show that his impairments and general health were improving, and that as of April 2005, his viral load had decreased to less than fifty, and his CD4 count had increased to 875. (Id. at 177-93, 121-57.)

In addition, since Dr. Johnson prescribed Plaintiff with the medication "Isoniazid" in November 2004 – in response to his positive PPD test – the subsequent medical records indicate that he responded well to this treatment and should have finished this treatment before the July 12, 2005 administrative hearing. (Id. at 189-93.) The medical records also show that Plaintiff's only noted skin condition, seborrhea dermatitis on his face, was responding well to treatment with Lotrisone ointment. (Id. at 174, 176.)

Lastly, the ALJ found that Plaintiff only appeared to be depressed during one visit with Dr. Johnson, and since he did not receive mental health treatment following that visit, he did not have a medically determinable impairment. (Id. at 13, 191, 193.) As the ALJ noted, in his visit directly following his report of depression, Plaintiff stated that he did not follow up with mental health treatment because he felt better. (Id.) Based on this record evidence, the ALJ properly found that Plaintiff did not meet or equal the regulations listing for HIV, and correctly proceeded to step four of the required analysis.

### iv. Step 4

At step four, the Commissioner considers whether the claimant's residual functional capacity ("RFC") permits him or her to return to past relevant work. See 20 C.F.R §§ 404.1520(f), 404.1560(b). If found able to return to his or her past relevant work, a claimant is not disabled within the meaning of the regulations. See 20 C.F.R. § 404.1520(f).

RFC is defined in the regulations as "the most [a claimant] can still do" after considering the effects of "physical and mental limitations that affect what [he or she] can do in a work

14

setting." 20 C.F.R. § 404.1545(a)(1). "A claimant's RFC is not concerned with the type of impairment, but only the tasks a claimant remains able to perform <u>after</u> the abilities that are significantly impaired by the disability are removed." See Beckwithe, 371 F. Supp. 2d at 201 (emphasis in original); see also 20 C.F.R § 416.945(a)(1).

"Past relevant work" is defined as work performed within the last fifteen years or fifteen years prior to the date that disability was established. See 20 C.F.R. § 404.1565. In determining past relevant work, the employment must have lasted long enough for the claimant to learn to do the job and have developed the skills to do such work. See id. In order to determine that a claimant can perform his or her past relevant work, the ALJ must find that the claimant retains the necessary RFC to perform the functional job demands of such work as he or she had previously performed them or as they are generally performed throughout the national economy. See Halloran v. Barnhart, 362 F.2d 28, 33 (2d Cir. 2004). The regulations allow the ALJ to rely upon the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") to determine whether a claimant's RFC prevents him or her from performing his or her past relevant work. See 20 C.F.R. § 404.1560(b)(2).

Moreover, when a medically determinable impairment exists, the ALJ must consider objective medical evidence to determine whether the claimant suffers from disability. See 20 C.F.R § 404 1529(c). When examining the record and making a detailed evaluation, the Commissioner can "rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983); see also Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 861 (2d Cir. 1990).

"The Commissioner does not have to accept [the claimant's] subjective testimony about [his or her] symptoms without question." Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y.

15

1998) (internal quotation marks omitted). Rather, "[a]n ALJ must assess subjective evidence in light of objective medical facts and diagnoses." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). Plaintiff's subjective complaints of pain must be supported by medical facts that show impairments that could lead to such pain. See 20 C.F.R. § 404.1529(a).

If a claimant's complaints of pain disproportionately exceed a level supported by objective medical evidence, the ALJ must examine additional factors. See 20 C.F.R. § 404.1529(c)(3). These factors include (1) the claimant's daily activities, (2) the nature, onset, duration, frequency, radiation of the pain and other symptoms; (3) precipitating or aggravating factors; (4) type, dosage, effectiveness and adverse side-effects of medication that the claimant has taken to alleviate the pain; (5) treatment, other than medication, for relief of pain; and (6) any measures which the claimant uses or has used to relieve his or her pain or other symptoms. See id.; see also Jordan v. Barnhart, 29 Fed. Appx. 790, 794 (2d Cir. 2002). However, "it is not sufficient for the [ALJ] to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible . . . [or to] simply to recite the factors that are described in the regulations for evaluating symptoms." Hardhardt v. Astrue, No. 05-CV-2229 (DRH), 2008 WL 2244995, at *10 (E.D.N.Y. May 29, 2008) (internal quotation marks omitted).

In the instant case, the ALJ considered all of the facts in the record and found that Plaintiff had some limitation. (Tr. at 13.) This conclusion was more favorable than even that of the treating physician, Dr. Marc Johnson, who assessed Plaintiff to have no limitations on July 10, 2003. (Id. at 101-06.) The ALJ found that Plaintiff retained the following RFC: performing work at the light exertion level; lifting or carrying twenty pounds occasionally and ten pounds frequently; standing or walking at least six hours; sitting at least six hours in an eight-hour

workday. (Id. at 14.) This RFC is consistent with Plaintiff's testimony that he could lift or carry twenty to twenty-five pounds and has had no problem sitting or standing. (Id. at 223.)

As far as Plaintiff's past relevant work, the evidence shows that he has been employed as a mail handler, electrician helper, plumber helper, and construction worker. (Id. at 69.) He last worked as a mail handler in October 1991. (Id. at 69.) Plaintiff filed for disability benefits less than twelve years later, thus placing his past relevant work as a mail handler in the fifteen-year window required by the regulations. (Id. at 41, 199.)

The DOT classifies this type of work, "mail handler," as light work.[5] Further, it is Plaintiff who bears the burden of demonstrating that he cannot return to his former employment. See Melville v. Apfel, 198 F. 3d 45, 51 (2d Cir. 1999). In both the work history report and in his testimony at the administrative hearing, Plaintiff indicated that his work as a mail handler required him to lift or carry ten-pound bundles of mail, twenty-pound bundles at the heaviest, and that the work involved standing and walking for six hours each in a workday. (Tr. at 71, 208.) Accordingly, the ALJ determined that Plaintiff's past relevant work as a mail handler constituted "light work" and that he could still perform this work in spite of the limitation of his RFC. (Id. at 14.)

In making her assessment, the ALJ complied with the requirements of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p as she reviewed all symptoms complained of by Plaintiff, and considered whether his symptoms could reasonably be consistent with the objective record evidence. (Id. at 13.) The ALJ also considered the opinions of various medical sources, including his initial attending physician and Dr. Johnson. (Id.) The ALJ's judgment concerning

---

[5] See DOT Code 209.687-014 (4th ed. 1991), available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02A.HTM (last visited July 23, 2009); see also DOT Code App. C, at IV, available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (defining the letter "L" next to the term "STRENGTH" in DOT Code 209.687-014 as the symbol for "light work") (last visited July 23, 2009).

17

the nature and severity of Plaintiff's impairments reflects these considerations (id.), and her final determination regarding Plaintiff's RFC and ability to return to his previous work as a mail handler is supported by substantial evidence.

For example, Plaintiff alleged his disability was due, in part, to objective impairments such as diarrhea and anemia, and subjective impairments such as headaches, knee, hand, neck and back pains. (Id. at 211, 216-18; see Docket Entry #12, at 1.) Yet, his treating physician, Dr Johnson, observed in recent examinations that his anemia workup was mostly normal and that the anemia was eventually resolved by medication. (Tr. at 177-81.) Neither the attending physician who initially treated him, nor Dr. Johnson, nor Ms. Stubbs ever noted any complaints of headaches, knee, hand, neck or back pains. (Id. at 170-93.)

In addition, at the administrative hearing Plaintiff testified that his pains in his knees, hands, and back were "not really that bad." (Id. at 216-18.) He also testified, in regards to his dizziness, that he gets "woozy and ha[s] to sit down every so often," and that this interferes with his ability to walk more than two blocks. (Id. at 222.) Yet, the ALJ found that this was not a credible complaint as the record provided no medical basis for it. (Id. at 13.)

In order to avoid legal error, "[t]he [ALJ's] determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight [he or she] gave to the individual's statements and the reasons for that weight." Hardhardt, 2008 WL 2244995, at *10. The record shows that Plaintiff repeatedly denied any opportunistic infections, diarrhea, weight loss, or any adverse side effects of his medication. (Tr. at 170, 174, 177, 178, 180, 181, 182, 187, 188, 189, 193.) With respect to his medications, the record shows that Dr. Johnson repeatedly noted that Plaintiff had responded well to medication

and demonstrated a very good immune response. (Id. at 175, 177, 180, 182.) The non-medical record evidence further supports the ALJ's decision as it reveals the variety of activities that he engages in each day. (Id. at 78-81, 219-23.) Thus, the ALJ's finding that Plaintiff's claims regarding the persistence and intensity of his symptoms, and the corresponding functional limitations, were exaggerated, not credible, and inconsistent with the medical record, was supported by substantial evidence. (See id. at 14, 170-93, 204-25.); see Gallagher ex rel. Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983).

Finally, Plaintiff argues that, because he often becomes dizzy from his headaches, he poses a special danger to other employees at his previous employer, the U.S. Postal Service. (See Docket Entry #12, at 1.) In this regard, he appears to be arguing that his dizziness is a relevant limitation for the purposes of determining whether he can perform past work. Despite these allegations, the medical evidence in the record does not indicate that Plaintiff ever suffered from or complained of such extreme dizziness or lightheadedness to justify his argument. (See Tr. at 170-93, 217, 222.) Therefore, the ALJ's finding that Plaintiff's allegations regarding his subjective limitations, including dizziness and lightheadedness, were not credible was supported by the record evidence. (Id. at 14.)

Based on the court's review of the record, the Commissioner's determination of Plaintiff's RFC properly led her to conclude that Plaintiff could return to his past relevant work as a mail handler.

### v. Step 5

Generally, at the final step of the analysis "the Commissioner . . . determines whether there is other work which the claimant could perform." Shaw, 221 F. 3d at 132. However, a determination that a claimant can return to his or her past work at step four ends the inquiry

19

required of the ALJ. See Williams, 204 F.3d at 49 ("[I]f an individual is found to be disabled (or not) at any step, the Commissioner is not required to proceed to the next step.") (citing 20 C.F.R. § 404.1520(a)). Because the ALJ found that Plaintiff could return to his previous employment as a mail handler, she did not move on to step five to determine what other light work Plaintiff might be able to perform. Because substantial evidence supports the ALJ's determination at step four, her decision not to proceed to step five was not in error. See Williams, 204 F.3d at 49.

## III. CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Judgment on the Pleadings is GRANTED. The Clerk of Court is directed to enter judgment dismissing Plaintiff's Complaint and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
July 30, 2009

s/ NGG
NICHOLAS G. GARAUFIS
United States District Judge